UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARA CHAMBLISS,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>　　　　　　　　　　Defendant. | Civ. No. 13-cv-6853 (KM)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

Kara Chambliss brings this action pursuant to 42 U.S.C. § 405(g) and 5 U.S.C. § 1383(c)(3) to review the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income. For the reasons set forth below, the Commissioner's decision is affirmed.

## I. BACKGROUND

Chambliss filed an application for Disability Insurance Benefits and Supplemental Security Income on May 12, 2010, alleging that, since May 1, 2009, she has been unable to engage in substantial gainful activity because she suffers from anemia, diabetes, mellitus, neuropathy, hypertension, obesity, attention deficit disorder and depression. (R. 27[1]) Her application was denied initially on September 17, 2010 and denied again upon reconsideration on March 4, 2011. (*Id.*) Chambliss then requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.*) A hearing was held before ALJ Richard West on April 20, 2012. (*Id.*) At the hearing, Chambliss, and also a vocational

---

[1] "R." refers to the pages of the administrative record filed by the Commissioner as part of her answer. (Dkt. Nos. 6-7).

1

expert, Rocco Miola, testified. On September 27, 2012, the ALJ issued a decision finding that Chambliss was not disabled. Chambliss then requested that the Appeals Council review the ALJ's decision. (*Id.* at 22) The Appeals Council denied her request for review on July 11, 2013, rendering the ALJ's decision final and ripe for review. (*Id.* at 5)

## II. DISCUSSION

To qualify for Title II Disability Insurance Benefits, a claimant must meet the insured status requirements of 42 U.S.C. § 423(c). To be eligible for Social Security Income, a claimant must meet the income and resource limitations of 42 U.S.C. § 1382. To qualify under either statute, a claimant must show that she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted (or can be expected to last) for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

### A. Five-Step Process and this Court's Standard of Review

Under the authority of the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. Review by the district court of an ALJ's decision to award or deny benefits necessarily incorporates a determination of whether the ALJ properly followed this five-step process. The steps may be briefly summarized as follows:

> Step 1: Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, move to step two.
>
> Step 2: Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, move to step three.
>
> Step 3: Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A. If so, the claimant is

automatically eligible to receive benefits; if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

Step 4: Determine whether, despite any severe impairment, the claimant retains the "residual functional capacity" to perform past relevant work. *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If not, move to step five.

Step 5: At this point, the burden shifts to the SSA to demonstrate that the claimant, considering her age, education, work experience, and residual functional capacity, is capable of performing jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91–92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

As to all legal issues, this Court conducts a plenary review. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). As to factual findings, this Court adheres to the ALJ's findings, as long as they are supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing 42 U.S.C. § 405(g)). Where facts are disputed, this Court will "determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (internal quotation and citation omitted). That "is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Id.* (internal quotation and citation omitted).

> [I]n evaluating whether substantial evidence supports the ALJ's findings . . . leniency should be shown in establishing the claimant's disability, and . . . the Secretary's responsibility to rebut it should be strictly construed. Due regard for the beneficent purposes of the legislation requires that a more tolerant standard be used in this administrative proceeding than is applicable in a typical suit in a court of record where the adversary system prevails.

*Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal citations and quotations omitted). When there is substantial evidence to support the ALJ's factual findings, this Court must abide by them. *See Jones*, 364 F.3d at 503

3

(citing 42 U.S.C. § 405(g)); *Zimsak*, 777 F.3d at 610–11 ("[W]e are mindful that we must not substitute our own judgment for that of the fact finder.").

This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Secretary's decision, or may remand the matter to the Secretary for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984); *Bordes v. Commissioner*, 235 F. App'x 853, 865–66 (3d Cir. 2007).

### B. The ALJ's Decision

The ALJ concluded that Chambliss was not disabled. His determinations are as follows:

At step one, the ALJ determined that Chambliss had not engaged in substantial gainful activity since May 1, 2009, the onset date of her alleged disability. (R. 29)

At step two, the ALJ found that Chambliss has the following severe impairments: anemia, diabetes, mellitus, peripheral neuropathy, hypertension, obesity, attention deficit disorder, and depression. (*Id.*)

At step three, the ALJ determined that none of Chambliss's impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404 Subpt. P, App. 1. (*Id.* at 30)

At step four, the ALJ found that Chambliss could perform sedentary work, as well as work that involved "occasional stooping, kneeling, crouching or balancing." (*Id.* at 31) The ALJ further found that Chambliss could perform specific tasks, including "occasional typing" and "frequent fingering," and that she can "understand, remember, and carry out instructions." (*Id.*) Based on this residual functional capacity, the ALJ determined that "there is no reason why [Chambliss] would be unable to perform unskilled work activity." (*Id.* at

4

33) In light of this "restriction to simple work tasks," the ALJ also determined that Chambliss is "unable to perform past relevant work." (*Id.* at 35)

At step five, after considering Chambliss's "age, education, work experience, and residual functional capacity," the ALJ found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.*) Accordingly, as noted above, such a finding requires the ALJ to conclude that a claimant is not disabled. Here, the ALJ ultimately concluded that Chambliss is not disabled within the meaning of the Social Security Act, and, consequently, was not entitled to Disability Insurance Benefits or Supplemental Security Income. (*Id.* at 36)

### C. Chambliss's Appeal

Chambliss contends on appeal that the ALJ's decision is not supported by substantial evidence. She argues that the ALJ (1) failed to properly weigh the medical evidence before him; (2) failed to properly evaluate her credibility; (3) failed to adequately consider her obesity pursuant to Social Security Ruling ("SSR") 02-1p; and (4) relied on flawed vocational expert testimony.

### D. Analysis

### 1. The ALJ Properly Weighed the Medical Evidence

Chambliss argues that the ALJ failed to defer to the opinions of her treating internist, Dr. John Yavorsky, regarding her residual functional capacity. Dr. Yavorsky's opinions, she claims, are supported by appropriate medical findings and were therefore entitled to controlling weight. Chambliss argues in the alternative that even if Dr. Yavorksy's opinions were not entitled to controlling weight, the ALJ nonetheless failed to afford them sufficient deference. Chambliss also argues that the ALJ "erred by only providing a

conclusory rejection of the opinions from cardiologist Dr. [Michael] Lux as not supported by appropriate testing." (Pl. Br.[2] at 19)

The regulations governing the evaluation of medical opinion evidence in actions for social security benefits state: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 416.927(c)(2); *see also* 20 C.F.R. § 404.1527(c)(2).[3] The Third Circuit has stated that unless there is contradictory medical evidence in the record, an ALJ may not reject a treating physician's opinion. *Brownawell v. Comm'r Of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008). An ALJ's unsupported judgment, speculation or lay opinion is not sufficient. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).

Where a medical opinion is not given controlling weight, the ALJ is required to weigh several factors to determine how much weight it should receive, including: (i) the examining relationship between the claimant and the doctor; (ii) the treatment relationship between the claimant and the doctor; (iii) the extent to which the opinion is supported by relevant evidence; (iv) the extent to which the opinion is consistent with the record as a whole; and (v) whether the doctor providing the opinion is a specialist. *See* 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). The ALJ's evaluation of these factors must "be accompanied by a clear and satisfactory explanation of the basis on which [they] rest." *Buckley v. Astrue*, 2010 WL 3035746, at *9 (D.N.J. Aug. 3, 2010). Although "contradictory medical evidence is required for an ALJ to reject a treating physician's opinion outright, such an opinion may be afforded 'more or

---

[2] This brief and the Commissioner's opposition were submitted pursuant to L. Civ. R. 9.1.
[3] 20 C.F.R. § 416.927(c)(2) applies to actions for Supplemental Security Income. Actions for Disability Insurance Benefits are governed by 20 C.F.R. § 404.1527(c)(2), which contains identical language.

6

less weight depending on the extent to which supporting explanations are provided.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).

### a. Opinions of Dr. Yavorsky

Dr. Yavorsky administered to Chambliss a Physical Residual Functional Capacity Questionnaire on October 25, 2010, and a Multiple Impairment Questionnaire on March 16, 2012. (Exs. 21F, 30F) Based on her answers to these questionnaires, Dr. Yavorsky determined that Chambliss is unable to sit, stand, or walk for more than two hours in an eight-hour work day, and is capable of lifting no more than 20 pounds and carrying no more than 10 pounds on occasion. (R. 34 (citing Exs. 21F, 30F)) He further found that Chambliss must be able to "shift positions at will" and faced "significant limitations in reaching, handling and fingering." (*Id.*) In light of these conclusions, Dr. Yavorsky opined that Chambliss was "incapable of even low stress work" and that she would be absent from work more than three to four times per month. (*Id.*)

Chambliss argues that the ALJ erred by not giving controlling weight to Dr. Yavorsky's opinions when assessing her residual functional capacity. I disagree. "The law is clear...that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Brown v. Astrue*, 649 F.3d 193, 197 n. 2 (3d Cir. 2011) Here, the ALJ found that Dr. Yavorsky's opinions were not supported by medically acceptable diagnostic techniques, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), and were contradicted by medical and other evidence in the record.

Dr. Yavorsky's assessment of the severity and extent of Chambliss's impairment was based largely on her self-reporting during his administration of the two questionnaires. As the ALJ stated (R. 34), many of the limitations from which she claimed to suffer—such as the duration of her ability to sit or

stand—are not corroborated by any independent medical evidence. *See Cerrato v. Comm'r of Soc. Sec.*, 386 F. App'x 283, 286 (3d Cir. 2010) (subjective statements of symptoms alone are not sufficient to find disability); *La Corte v. Bowen*, 678 F.Supp. 80, 83 (D.N.J. 1988) (holding that an ALJ may give little weight to a claimant's complaints and may instead rely on medical evidence or activity reports the ALJ deems more credible). Moreover, certain of those restrictions were inconsistent with Dr. Yavorsky's previous medical findings. For example, Dr. Yavorksy's treatment notes from January 2011 state that Chambliss was "able to sit comfortably on the examination table without difficulty or...pain." (R. 516) Similarly, with regard to Chambliss's limitations on reaching, handling, and fingering items, the ALJ noted:

> [W]hile I do find that there are limitations due to peripheral neuropathy, it is not at a level suggested by Dr. Yavorsky in his assessments. He previously reported full range of motion in her upper extremities, with the ability to fully extend both hands and normal grip strength of 5/5. He reported that the claimant can oppose all fingers and that she can separate paper and button items.

(*Id.*) In addition, the ALJ found that Dr. Yavorsky's belief that Chambliss is incapable of even low-stress work was contradicted by her testimony that she manages her household and is the primary caregiver of her minor daughter. (*Id.* (citing R. 60-61))

I therefore find that the ALJ stated reasons for his decision to decline to afford controlling weight to Dr. Yavorsky's opinion, and that his decision is supported by substantial evidence.

Chambliss next argues that even if the ALJ did not give controlling weight to Dr. Yavorksy's opinion, "it is still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927." (Pl. Br. 18) I find that the ALJ appropriately discussed Dr. Yavorsky's

8

assessment of Chambliss's limitations in his residual functional capacity finding.

The ALJ identified Dr. Yavorsky as "the claimant's treating internist." (R. 33) In so doing, he described their examining and their treatment relationships, and made it clear that Dr. Yavorsky was not a specialist—satisfying three of the factors set forth in the regulations cited by Chambliss. *See* 20 C.F.R. §§ 404.1527(c)(1),(2), (5); 416.927(c)(1),(2), (5). The ALJ then addressed the remaining factors—the supportability and consistency of Dr. Yavorsky's opinion. *See* 20 C.F.R. §§ 404.1527(c)(3)-(4); 416.927(c)(3)-(4). The ALJ partially credited Dr. Yavorsky's opinion, stating: "I do find that there are limitations due to peripheral neuropathy...which would make prolonged standing and walking difficult when combined with [Chambliss's] obesity." (R. at 34) However, for the reasons stated above, the ALJ ultimately found that Dr. Yavorsky's opinion as to the severity of Chambliss's limitations was either unsupported or contradicted by other record evidence. Accordingly, I find that there is substantial evidence for the ALJ's decision to assign Dr. Yavorsky's opinion some, but not controlling, significance.

### b. Dr. Lux

Dr. Michael Lux, Chambliss's treating cardiologist, opined that she could neither sit nor stand for more than one hour in an eight hour work day, that she is unable to lift or carry any item weighing more than five pounds frequently or ten pounds occasionally, that she is incapable of sustaining even low stress, and that, in light of these limitations, she would be absent from work more than three times per month. (R. 34 (citing Ex. 26F)) The ALJ gave "little weight" to Dr. Lux's opinion. The question before me, then, is again whether the ALJ stated reasons for discounting Dr. Lux's opinion, and whether his decision to do so is supported by substantial evidence.

9

The ALJ described in detail how Dr. Lux's opinion regarding Chambliss's residual functional capacity "was not consistent with cardiovascular testing and findings delineated in his treatment records." (*Id.*) In particular, the ALJ noted:

> [T]here is no evidence of severe cardiac impairment. The claimant is treated for hypertension but the results of the stress test were negative for ischemia and the result of myocardial perfusion imaging showed normal left ventricle, no perfusion defects and normal left ventricle ejection fraction of 69%. The claimant reported two incidents of palpitations but nothing since and diagnostic evidence showed no cardiac arrhythmia or abnormalities…There is no indication of chest pain related to ischemia and palpitations, based on medical record, happened only twice.

(*Id.* (citing Ex. 25F)) The ALJ also found that Dr. Lux's conclusion that Chambliss could not tolerate even low-stress work was "inconsistent with her managing a household and caring for her daughter." (*Id.*)

In addition to the discrepancies identified by the ALJ, I find that Dr. Lux's pronouncement of disability is belied by his conservative course of treatment. There are no records suggesting that Chambliss ever required surgery or hospitalization for her cardiac impairments.[4] At most, it appears that she took medication and underwent a series of tests, all of which either ruled out or failed to conclusively show that she suffered from ischemia, arrhythmia, or other serious cardiac conditions. (Ex. 25F). For example, a CT angiography performed on August 18, 2011 indicated that Chambliss did not require a cardiac catheterization. (R. 610)

I also note that, on at least one documented occasion, Chambliss engaged in activity that far exceeded the limitations on her functional capacity described by Dr. Lux. In May 2011— several months after first receiving

---

[4] On June 11, 2010, Chambliss was seen in the emergency room at Saint Barnabas Hospital, but for complications arising from her anemia. (*See* R. 292, 323)

treatment from Dr. Lux and more than two years after the onset of her alleged disability—Chambliss stated to Dr. Lux that she experienced "some chest tightness" after "playing baseball with her daughter and throwing a ball back and forth." (R. 604) Dr. Lux's treatment notes indicate that "the tightness has been resolved since [Chambliss] has been more careful with her diet." (*Id.*) In any event, such an admission by Chambliss tends to contradict Dr. Lux's opinion and provides further grounds for the ALJ's conclusions. (R. 34)

For the foregoing reasons, I find no error in the ALJ's assignment of little weight to Dr. Lux's opinion regarding Chambliss's residual functional capacity.

### 2. The ALJ Properly Evaluated Chambliss's Credibility

Chambliss argues that the ALJ failed to properly evaluate her credibility in violation of SSR-96-7p. The ALJ's findings as to Chambliss's credibility, however, are supported by substantial evidence.

SSR 96-7p provides that "[i]n determining the credibility of the individual's statements, the adjudicator must consider the entire case record." *Id.* The regulation then prescribes a two-step process for evaluating a claimant's statements about her own physical or mental impairments. Such statements, by themselves, are insufficient to establish the existence of an impairment or disability. *Titles II & Xvi: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7P (S.S.A. July 2, 1996). Instead, the ALJ must first "consider whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the individual's pain or other symptoms." *Id.* Second, "once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the

adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.*

At this second step, if the ALJ finds that the claimant's symptoms suggest a greater restriction of function than can be demonstrated by objective evidence alone, he must also consider such factors as:

> (1) The individual's daily activities; (2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p (citing 20 CFR §§ 404.1529(c), 416.929(c)).

The ALJ's credibility determination "must contain specific reasons for the finding of credibility, supported by the evidence in the case record." SSR 96-7p; *see also* 20 C.F.R. §§ 404.1529(b), 416.929(b). In this case, the ALJ did what was required of him, articulating specific reasons for his credibility findings that were supported by the evidence in the record.

In conducting the two-step analysis prescribed by SSR 96-7p, the ALJ cited portions of Chambliss's testimony regarding the alleged symptoms of her neuropathy:

> The claimant testified that she had had neuropathy since 2009, which has gotten worse. She gets tingling in the tips of her hands and she can't hold things for long periods. Her hands cramp and this hinders her writing. She is unable to type because of tingling

12

> in the fingers. She gets swelling from her knees down in her legs, especially the ankles. Every day, she has to elevate her legs twice a day for about an hour...When sitting, her left leg gets numb and she must stand up and "get some circulation going." She can sit for 20 minutes before she must get up. She has difficulty walking because her feet cramp and swell. She has "pinched nerve" in her lower back. She sleeps about 4-5 hours a night.

(R. 32) At step one, the ALJ found that Chambliss suffered from a medically determinable impairment which could reasonably be expected to cause her alleged symptoms. (*Id.*) At step two, however, the ALJ determined that Chambliss's statements regarding the "intensity, persistence and limiting effects" of those symptoms "are not credible" to the extent they conflicted with his assessment of her residual functional capacity. (*Id.*)

In particular, Chambliss claimed to have disabling neuropathy in her hands and feet. Although the ALJ agreed that Chambliss suffered from neuropathy, he found that her statements regarding the extent of her impairment were contradicted by the record evidence and by her account of her daily activities. The ALJ noted that Dr. Yavorsky found that Chambliss had a full range of motion in her shoulders, elbows, wrists and spine. (*Id.* (citing Ex. 9F)) Dr. Yavorsky also found that Chambliss could walk at a reasonable pace without using a cane, had normal grip and leg strength, and had sufficient dexterity to extend both hands and make a fist. (*Id.* (citing Ex. 9F)) Evidence of Chambliss's daily activities also influenced the ALJ—her ability to clean at her own pace, manage a household, undertake chores with occasional assistance from family members, prepare food, and use a computer all counted against her testimony regarding the severity of her symptoms. (*Id.*)

Chambliss claims that in rejecting her testimony, the ALJ improperly "found no neurological testing in the record to substantiate the allegations of hand and foot neuropathy." (Pl. Br. at 22). That assertion and its implication that the ALJ simply ignored the relevant medical evidence are incorrect. The

ALJ expressly stated: "While the evidence *does establish peripheral neuropathy in the hands and feet*, the record evidence does not establish a level of severity to preclude occasional typing and frequent fingering." (R. 32)

Chambliss next claims that the ALJ improperly relied on evidence indicating that she could perform certain activities of daily living. (Pl. Br. 23) This, she says, runs afoul of the Third Circuit's decision in *Frankenfeld v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988). There, the Court found that the ALJ erred by rejecting medical reports created by the claimant's treating physicians "based solely on [his] observation of the claimant at the hearing, and claimant's testimony that he took care of his personal needs, performed limited household chores, and occasionally went to church." *Frankenfeld* is thus readily distinguishable—in this case, the ALJ relied on evidence of Chambliss's performance of daily activities to assess the credibility of *her* statements regarding the severity of her symptoms. And although the ALJ did cite her performance of daily activities when reviewing the opinions of her treating physicians, unlike the ALJ in *Frankenfeld*, he did not rely "solely" on that evidence. *Id.*; see Section II.D.1., *supra*. Chambliss's position here seems to imply that an ALJ cannot consider evidence of daily activities at all, which is not the case; the regulations governing the assessment of a claimant's statements explicitly state that the ALJ "*must consider* ... [t]he individual's daily activities." SSR 96-7p (emphasis added); *see also* 20 C.F.R. §§ 404.1529(c)(3)(ii), 416.929(c)(3)(ii).

In sum, then, I find that the ALJ's credibility determination is supported by substantial evidence. Chambliss's objections to the assessment of her credibility are unavailing.

14

### 3. The ALJ Properly Evaluated Chambliss's Obesity

Chambliss argues that the ALJ failed to adequately consider her obesity when determining her residual functional capacity in violation of SSR 02-1p.[5] However, the ALJ clearly considered Chambliss's obesity throughout the five-step process, as required by that regulation.

At step two, the ALJ found that Chambliss's obesity was a "severe" impairment. (R. 29)

At step three, the ALJ stated: "The claimant is obese at 5'5" tall and 325 pounds. Any effect the excess weight has had on other body systems is subsumed by the discussions of the associated impairments, consistent with Social Security Rule 02-1p." (*Id.* at 30)

At step four, the ALJ took Chambliss's obesity into account in determining her residual functional capacity. The ALJ noted that "[p]hysical impairments including obesity reasonably limit her to a sedentary residual functional capacity, but medical evidence is inconsistent with greater functional limitations." (*Id.* at 33) The ALJ then specifically noted that Chambliss's obesity may exacerbate the limitations she faces on account of her neuropathy, stating: "While [Chambliss] does have peripheral neuropathy, which would make prolonged standing and walking difficult when combined with her obesity, there is no evidence of sitting restrictions." (*Id.* at 34)

I therefore find that the ALJ adequately considered Chambliss's obesity and that there is substantial evidence in the record to support his functional capacity findings.

---

[5] SSR 02-1p requires the ALJ to consider a claimant's obesity throughout the five-step process. *See Titles II & Xvi: Evaluation of Obesity*, SSR 02-1P (S.S.A. Sept. 12, 2002).

15

## 4. The ALJ Properly Relied on the Vocational Expert Testimony

Chambliss's last argument is that the ALJ relied on flawed vocational expert testimony.

In finding that Chambliss was not disabled at step five of the five-step process, the ALJ relied on the vocational expert's testimony that jobs existed in the regional and national economy for a person suffering from her combination of impairments. (R. 35-36) The ALJ elicited this testimony by posing hypothetical questions to the vocational expert, as is customary. When posing such questions, "the ALJ must accurately convey to the [vocational expert] all of claimant's credibly established limitations." *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Chambliss argues that ALJ's residual functional capacity finding was deficient because it relied on an improper evaluation of the medical evidence in the record, an improper evaluation of her credibility, and failure to adequately consider her obesity. As a result, she says, the hypothetical questions that reflected this residual functional capacity were likewise deficient.

This argument depends on the contentions that I have already rejected. As I have explained, *supra*, there is substantial evidence in support of the ALJ's findings as to the weight assigned to the opinions of Chambliss's treating physicians, her credibility, and the treatment of her obesity. As there is no basis to impugn the ALJ's finding of residual functional capacity, there is also no basis for me to reject the ALJ's hypothetical questions, which incorporated that RFC finding.

Chambliss next argues that the ALJ failed to include her mental limitations in his hypotheticals. She states that "the ALJ found that Ms. Chambliss had moderate difficulties in concentration, persistence, and pace," but that "the accepted hypothetical did not include such a limitation." (Pl. Br.

at 27) This objection, too, is without merit. Although the ALJ's questions did not recite the particular words now quoted by Chambliss, they convey the same concept: the ALJ asked the vocational expert to consider a hypothetical person who "can understand, remember, and carry out simple instructions only." (R. 61) The Third Circuit has held that language nearly identical to that posed to the vocational expert here adequately reflected the same impairments cited by Chambliss. *See McDonald v. Astrue,* 293 F. App'x 941, 946-47 (3d Cir. 2008) ("[I]n line with her finding that [the claimant] only had 'moderate limitations with his ability to maintain concentration, persistence and pace,' the ALJ included in her hypothetical that the individual be limited to 'simple, routine tasks' and that he avoid noise extremes and bright or sudden light changes. Because the hypothetical was adequate, the vocational expert's testimony regarding other work provided substantial evidence for the ALJ's conclusion.")

I thus find that the ALJ posed adequate hypothetical questions to the vocational expert, and that his reliance on the vocational expert's testimony provided substantial evidence for his conclusion that "there are jobs that exist in sufficient numbers in the national economy that the claimant can perform." (R. 35)

### III. CONCLUSION

For the foregoing reasons, the ALJ's decision is **AFFIRMED**.

An appropriate order will issue.

Date: June 26, 2015

KEVIN MCNULTY, U.S.D.J.